UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

———————————————————————

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | No. 5:15-cv-05225 |
| | : | |
| TOLL BROTHERS, INC.; | : | |
| COMMONWEALTH FIRE PROTECTION | : | |
| COMPANY, INC.; | : | |
| UNITED INSULATION SERVICES, INC.; | : | |
| TOLL BROS., INC.; TOLL PA XIII, L.P., | : | |
| | : | |
| Defendants. | : | |

———————————————————————

**MEMORANDUM OPINION**

**Motion to Compel Arbitration, ECF No. 27 – Granted in Part**

**Joseph F. Leeson, Jr.**                                          **March 21, 2016**
**United States District Judge**

I.    **Introduction**

Between 2006 and 2007, Defendants Toll Bros., Inc. and Toll PA XIII, L.P. (collectively,

"Toll")[1], a developer and general contractor respectively, constructed a home located in Exton,

Pennsylvania. See Compl. ¶¶ 2, 4-5, 13. During the construction, Toll was responsible for

overseeing and directing various subcontractors who assisted with the work. Id. ¶ 4. Among

those subcontractors were Defendant Commonwealth Fire Protection Company, Inc., which

specializes in sprinkler systems, and Defendant United Insulation Services, Inc., which

specializes in the installation of insulation. Id. ¶¶ 6-9.

---

[1]         Allstate originally named "Toll Brothers, Inc." as a defendant to this action instead of Toll Bros., Inc. and
Toll PA XIII, L.P. Allstate and the latter defendants stipulated to the correction of this error by substituting them as
defendants and replacing all references to "Toll Brothers, Inc." in the Complaint with the proper names of these
defendants. See ECF No. 4. For convenience, both will be referred to as a single collective entity.

After construction was completed and the home was sold, Plaintiff Allstate Insurance Company provided the buyers with homeowner's insurance. Id. ¶ 2. On January 7, 2014, a frozen sprinkler pipe burst, causing damage in the amount of $160,148.88. Id. ¶ 18, 23. According to Allstate, the damage is due to a "wet fire suppression system" installed in an improperly insulated and unheated space. Id. ¶ 19. Allstate claims that each Defendant had a hand in this defect: Commonwealth Fire failed to properly install the sprinkler pipes in an area that would be protected from freezing temperatures, United Insulation failed to properly insulate the area near the sprinkler pipes, and Toll failed to properly monitor its subcontractors and inspect their work. Id. ¶¶ 15-17. Allstate, as subrogee of the buyers, asserts claims for negligence, breach of contract, and breach of express and implied warranties against each of them.

Pointing to an arbitration clause contained in the Agreement of Sale that the buyers entered into with Toll, Toll moves to compel arbitration and dismiss Allstate's Complaint. The pertinent section of the Agreement of Sale reads as follows:

> Arbitration: Buyer, on behalf of Buyer and all permanent residents of the Premises, including minor children, hereby agree [sic] that any and all disputes with Seller [which the Agreement defines as Toll PA XIII, L.P.], Seller's parent company or their subsidiaries or affiliates arising out of the Premises, this Agreement, the Home Warranty, any other agreements, communications or dealings involving Buyer, or the construction or condition of the premises including, but not limited to, disputes concerning breach of contract, express and implied warranties, personal injuries and/or illness, mold-related claims, representations and/or omissions by Seller, on-site and off-site conditions and all other torts and statutory causes of action ("Claims") shall be resolved by binding arbitration in accordance with the rules and procedures of Construction Arbitration Services, Inc. ("CAS") or its successor or an equivalent organization mutually agreed upon by the Parties. If CAS is unable to arbitrate a particular claim, then that claim shall be resolved by binding arbitration pursuant to the Construction Rules of Arbitration of the American Arbitration Association or its successor or an equivalent organization mutually agreed upon by the Parties. In addition, Buyer agrees that Buyer may not initiate any arbitration proceeding for any Claim(s) unless and until Buyer has first given Seller specific written notice of each claim (at 250 Gibraltar Road, Horsham, PA 19044, Attn: Warranty Dispute Resolution) and given Seller a reasonable opportunity after such notice to

cure any defect, including the repair of the Premises, in accordance with the Home Warranty. The provisions of this paragraph shall be governed by the provisions of the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq. and shall survive settlement.

BUYER HEREBY WAIVES THE RIGHT TO A PROCEEDING IN A COURT OF LAW (INCLUDING WITHOUT LIMITATION A TRIAL BY JURY) FOR ANY CLAIMS OR COUNTERCLAIMS BROUGHT PURSUANT TO THIS AGREEMENT. THE PROVISIONS OF THIS SECTION SHALL SURVIVE SETTLEMENT. [2]

Allstate opposes Toll's motion to compel arbitration, arguing that the arbitration clause and the Agreement of Sale are unenforceable. Those contentions lack merit, which means that Allstate must arbitrate its claims against Toll. However, since the buyers did not enter into an agreement to arbitrate with Commonwealth Fire or United Insulation, Toll cannot compel Allstate to resolve those claims through arbitration, and those claims will remain in this action.

## II.    The arbitration clause is enforceable.

Initially, it is important to observe the grounds on which Allstate is not attacking the arbitration clause. Allstate does not argue that its claims do not fall within the scope of this clause, or that Toll Bros., Inc. is not a "parent company," "subsidiary," or "affiliate" of Toll PA XIII, L.P.—the signatory to the Agreement—or that the buyers were not aware of the existence of the arbitration clause. Instead, Allstate contends that the parties never formed an agreement to arbitrate because the buyers did not receive any consideration for entering into the Agreement of

---

[2]    Toll's Mot. Compel Ex. D ¶ 11, ECF No. 27-4. The text that is underlined here is set in bold in the Agreement, copies of which were attached both to Toll's present motion and to Allstate's response. While Allstate did not attach a copy of the Agreement to the Complaint, Allstate relies upon the Agreement in connection with its claims against Toll, some of which sound in breach of contract, and there is no dispute over its authenticity, all of which means that the Agreement is a proper object of consideration at this stage. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." (quoting In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig., 7 F.3d 357, 368 n.9 (3d Cir. 1993))); Booth v. BMO Harris Bank, N.A., No. CIV.A. 13-5968, 2014 WL 3952945, at *2 n.2 (E.D. Pa. Aug. 11, 2014) (reviewing an agreement that was attached to the defendant's motion to compel arbitration).

Sale, and that the arbitration clause is unconscionable under Pennsylvania law.[3] Neither contention is meritorious.

## A.  The Agreement of Sale was supported by consideration.

According to Allstate, "[i]t was only after the [buyers] had paid a deposit and construction had commenced, that Toll Brothers presented the mandatory arbitration provision to the [buyers] within the Sales Agreement," which means that the buyers did not receive any consideration for entering into the Agreement. See Allstate Mem. Opp'n 7, ECF No. 29.

Before reaching the merits of that contention, the Court must answer a preliminary question: is this a question for the Court to resolve, or an arbitrator? The Supreme Court determined that unless a party resisting arbitration is challenging "the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." See Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46 (2006) (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967). Accordingly, "attacks on the validity of an entire contract, as distinct from attacks aimed at the arbitration clause, are within the arbitrator's ken." Preston v. Ferrer, 552 U.S. 346, 353 (2008) (citing Prima Paint, 388 U.S. at 403-04). This suggests that Allstate's challenge must be arbitrated, because a lack of consideration would call the entire agreement—not just an arbitration clause within—into question. See Antkowiak v. TaxMasters, 455 F. App'x 156, 161 (3d Cir. 2011) ("Antkowiak claims he received no additional consideration for signing the Engagement Agreement. . . . Even if we were to assume that this is an appropriate matter for a court, and not an arbitrator, to decide, see Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445 (2006), the argument is unavailing.").

---

[3]     Neither Allstate nor Toll addresses the question of which law is applicable, but both parties cite to the law of Pennsylvania, which is Toll's home state and the location of the residence, and the Agreement of Sale does not contain a choice of law provision. See Compl. ¶¶ 2, 3; Toll's Mot. Compel Ex. D.

However, it is also "well settled that where the dispute at issue concerns contract formation, the dispute is generally for the courts to decide." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 296 (2010) (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). Consideration is "a required element of contract formation" in Pennsylvania. ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 665 (3d Cir. 1998) (citing Channel Home Ctrs. v. Grossman, 795 F.2d 291, 299 (3d Cir. 1986)). Consistent with that reasoning, the Third Circuit has entertained a challenge to an arbitration agreement on the ground that the agreement lacked consideration. See Blair v. Scott Specialty Gases, 283 F.3d 595, 603-04 (3d Cir. 2002) (examining whether an arbitration agreement was supported by consideration); see also Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160-61 (3d Cir. 2009) (recognizing that questions of contract formation are generally for the courts, and that consideration is a requirement of contract formation under Pennsylvania law).

By stating that issues of contract formation are "generally" for the courts, Granite Rock leaves open the possibility that those too could be delegated to arbitration. See Janiga v. Questar Capital Corp., 615 F.3d 735, 738 (7th Cir. 2010) (citing Rent-A-Center, 561 U.S. 71-76) ("The district court decided that it should address the contract-formation question. . . . We agree with the district court that the existence of a contract is an issue that the courts must decide prior to staying an action and ordering arbitration, unless the parties have committed even that gateway issue to the arbitrators."); see also Granite Rock, 561 U.S. at 296-97 (observing that in Buckeye, the Court distinguished between the "generally nonarbitral question whether an arbitration agreement was 'ever concluded' from the question whether a contract containing an arbitration clause was illegal when formed" (emphasis added)). The possibility that even disputes over contract formation could be committed to arbitration is consistent with a third principle of the

5

Court's arbitration jurisprudence: "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." See Rent-A-Center, 561 U.S. at 68-69 69 (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-85 (2002); Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003) (plurality opinion)). The is one caveat: "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." Id. at 69 n.1 (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).

Thus, the Court must ask whether the parties intended to arbitrate even this threshold dispute. But where to look for clear and unmistakable evidence that the parties intended to arbitrate a dispute over whether their agreement to arbitrate was ever formed presents a difficult problem. "Clear and unmistakable 'evidence' of agreement to arbitrate arbitrability might include . . . a course of conduct demonstrating assent, or . . . an express agreement to do so." Rent-A-Center, 561 U.S. at 79-80 (Stevens, J., dissenting) (citation and footnote omitted). When one party contends that an agreement to arbitrate was never formed, looking to the text of that very agreement is problematic because the agreement is only a valid indicator of the parties' intent if they agreed to be bound by its terms. The Court in Granite Rock appeared to recognize that while the text of an arbitration agreement may be able to supply evidence that the parties intended to commit certain threshold arbitrability questions to arbitration, the same is not true when the threshold question is one of formation. There, the Court observed that before a court may conclude that two parties intended to arbitrate a dispute, the court must find that "their express agreement to arbitrate was validly formed and (absent a provision clearly and validly committing such issues to the arbitrator) is legally enforceable and best construed to encompass

the dispute." <u>See</u> <u>Granite Rock</u>, 561 U.S. at 303. The placement of the parenthetical in that passage appears to "draw a distinction between the issue of contract formation and the issues of contract enforceability and interpretation," suggesting that the text of the agreement to arbitrate cannot serve as the basis for finding that parties clearly intended to arbitrate a dispute over whether that very agreement had ever been formed. <u>See</u> Karen Halverson Cross, <u>Letting the Arbitrator Decide Unconscionability Challenges</u>, 26 Ohio St. J. on Disp. Resol. 1, 59-60 (2011) (reading <u>Granite Rock</u> to suggest that "a delegation clause that purports to vest in the arbitrator exclusive authority to determine a contract's formation would be invalid").

The Third Circuit appears to have reached this conclusion in <u>China Minmetals Materials Import & Export Co. v. Chi Mei Corp.</u>, 334 F.3d 274, 288 (3d Cir. 2003). There, one party contended that it was not bound by an arbitration clause that was contained within a series of contracts because it had never signed those contracts (the party contended that its signature had been forged). <u>Id.</u> at 277. The arbitration clause incorporated a rule of arbitration that vested the arbitrators with the power to determine their own jurisdiction, but the court refused to view that provision as evidence of the parties' intent. The court reasoned that the incorporation of that rule into the contract would be "relevant only if the parties actually agreed to its incorporation," because "a contract cannot give an arbitral body any power, much less the power to determine its own jurisdiction, if the parties never entered into it." <u>See</u> <u>id.</u> at 288. It follows, therefore, that when the parties to an arbitration agreement dispute whether any agreement to arbitrate "was ever concluded," <u>see</u> <u>Buckeye</u>, 546 U.S. at 444 n.1, they may only be compelled to submit that dispute to arbitration if there is clear and unmistakable evidence from some extrinsic source that they intended to arbitrate that threshold question. <u>See</u> <u>Sandvik AB v. Advent Int'l Corp.</u>, 220 F.3d 99, 111-12 (3d Cir. 2000) (suggesting that "negotiating parties [could] elect[] to enter pre-

agreements to arbitrate disputes arising out of efforts to negotiate future contracts," which could bind them to arbitrate even a dispute over the existence of one of those future contracts); Restatement (Third) of the U.S. Law of International Commercial Arbitration § 2-12 reporter's note d (Am. Law Inst., Tentative Draft No. 4, 2015) (adopting this view); Cross, supra, at 26 nn.113-15 (noting that a brief submitted in First Options, which was co-authored by Chief Justice Roberts prior to the commencement of his judicial service, argued that when a party contends that it never entered into an arbitration agreement, it would be appropriate to submit that issue to arbitration only "in very limited circumstances, such as where the parties have made a formal stipulation or submission agreement").[4]

Is a lack of consideration tantamount to a party's contention that it never signed an agreement, such as in China Minmetals and First Options, or that "the signor lacked authority to commit the alleged principal," or that "the signor lacked the mental capacity to assent," see Buckeye, 546 U.S. at 444 n.1, such that, without consideration, the text of an agreement is not a valid indicator of the parties' mutual intent? The answer to this question depends upon how the role of consideration is viewed.[5] If consideration serves the "cautionary function of bringing home to the promisor the fact that his promise is legally enforceable and an evidentiary function . . . of making it more likely that an enforceable promise was intended," see Gibson v. Neighborhood Health Clinics, Inc., 121 F.3d 1126, 1131 (7th Cir. 1997) (quoting Scholes v. Lehmann, 56 F.3d 750, 756 (7th Cir. 1995)), then an absence of consideration means that the text of the agreement is a questionable source of evidence of the parties' mutual intent. But if

---

[4]    First Options itself also lends support to this view. There, two parties resisted arbitration on the ground that they had never signed the document containing an agreement to arbitrate. When the Court conducted its search for clear and unmistakable evidence that the parties had intended to arbitrate this threshold issue, the Court examined extrinsic evidence—namely, whether the parties' course of conduct revealed an intent to submit this question to arbitration—but did not examine the text of the agreement, which the parties insisted they had never signed. See First Options, 514 U.S. at 946-47.

[5]    See generally James D. Gordon III, A Dialogue about the Doctrine of Consideration, 75 Cornell L. Rev. 987 (1990).

consideration is simply a substantive requirement for an enforceable agreement, see Restatement (Second) of Contracts § 72 cmt. c (Am. Law Inst. 1981)—one that "ill serves the evidentiary function of formality, let alone the other functions of form," see 3 Richard A. Lord, Williston on Contracts § 7.8 (4th ed. 2008)—then the text of an agreement to arbitrate could be seen as reliable evidence of the parties' intent, regardless of one party's protest that the agreement cannot be enforced. Cf. Rent-A-Center, 561 U.S. at 69 n.1 (concluding that the text of an arbitration agreement could serve as evidence of the parties' intent to arbitrate arbitrability despite the fact that one party contended that the agreement was unconscionable and therefore invalid).[6]

Ultimately, this Court does not need to decide whether, without consideration, the Agreement can function as a reliable indicator of the parties' intent, because even if it can, the text of the arbitration clause does not contain clear and unmistakable evidence that they intended to arbitrate threshold questions of arbitrability. The arbitration clause states that the parties agreed to arbitrate "any and all disputes . . . arising out of the Premises, this Agreement, the Home Warranty, any other agreements, communications or dealings involving Buyer, or the construction or condition of the premises." While "phrases such as 'arising under' and 'arising out of' . . . are normally given broad construction," Battaglia v. McKendry, 233 F.3d 720, 727 (3d Cir. 2000), the clause is silent on the matter of who should decide a dispute over arbitrability. The burden of showing that the parties intended to arbitrate arbitrability is substantial one, and "'silence or ambiguity on the "who should decide arbitrability" point' must be resolved in favor

---

[6]     The latter view could be taken a step further to suggest that a challenge to an arbitration agreement for want of consideration should be viewed as challenging the entire agreement's enforceability, rather than calling into question whether any agreement to arbitrate ever existed, and thus treated the same as challenges sounding in fraud in the inducement or illegality, despite the fact that contract law labels the requirement of consideration a matter of "formation." See Granite Rock, 561 U.S. at 304 n.11 ("[I]t is not the mere labeling of a dispute for contract law purposes that determines whether an issue is arbitrable. The test for arbitrability remains whether the parties consented to arbitrate the dispute in question."). But see Janiga, 615 F.3d at 742 (citing Gibson, 121 F.3d 1126) (suggesting that a dispute over consideration is a matter of formation within the meaning of Granite Rock).

of judicial resolution." <u>Puleo v. Chase Bank USA, N.A.</u>, 605 F.3d 172, 187-88 (3d Cir. 2010) (en

banc) (quoting <u>First Options</u>, 514 U.S. at 945; <u>Ehleiter v. Grapetree Shores, Inc.</u>, 482 F.3d 207,

221 (3d Cir. 2007)). This portion of the arbitration clause does not clearly and unmistakably

reveal that the parties intended for an arbitrator to resolve disputes over the formation of their

agreement to arbitrate. <u>See</u> <u>Battaglia</u>, 233 F.3d at 723-24 (finding that an agreement to arbitrate

"any controversy aris[ing]" under the underlying agreement offered no indication that the parties

intended to arbitrate the arbitrability of a dispute concerning the agreement's validity);[7] <u>see also</u>

<u>Granite Rock</u>, 561 U.S. at 304-05 (observing that when parties agree to arbitrate all disputes

"arising under" an underlying agreement, that language "does not so obviously cover disputes

about the [agreement's] own formation").[8]

There is another passage in the arbitration clause that bears mention. The arbitration

clause provides that any arbitration proceeding shall be conducted "in accordance with the rules

and procedures of Construction Arbitration Services, Inc. ("CAS") or its successor or an

equivalent organization mutually agreed upon by the Parties," and "[i]f CAS is unable to

arbitrate a particular claim, then that claim shall be resolved by binding arbitration pursuant to

---

[7]    The <u>Battaglia</u> court found that "phrases such as 'arising under' and 'arising out of' . . . are generally construed to encompass claims going to the formation of the underlying agreements." 233 F.3d at 727 (citing <u>St. Paul Fire & Marine Ins. Co. v. Emp'rs Reinsurance Corp.</u>, 919 F. Supp. 133, 135 (S.D.N.Y. 1996)). But the court reached that conclusion in the context of construing the scope of the arbitration clause, not while inquiring whether there was clear and unmistakable evidence that the parties intended to arbitrate that threshold question.
[8]    Most other circuits that have considered the question agree that a broadly worded arbitration clause is not enough, standing alone, to amount to clear and unmistakable evidence that the parties intended to arbitrate arbitrability. <u>See</u> <u>Carson v. Giant Food, Inc.</u>, 175 F.3d 325, 330 (4th Cir. 1999) ("[B]road arbitration clauses that generally commit all interpretive disputes 'relating to' or 'arising out of' the agreement do not satisfy the clear and unmistakable test."); <u>Riley Mfg. Co. v. Anchor Glass Container Corp.</u>, 157 F.3d 775, 780 (10th Cir. 1998) ("[A]lthough the arbitration clause in the Manufacturing Agreement is broadly written, referring to 'any and all disputes arising out of or relating to' the contract, there is no hint in the text of the clause or elsewhere in the contract that the parties expressed a specific intent to submit to an arbitrator the question whether an agreement to arbitrate exists or remained in existence . . . ."); <u>McLaughlin Gormley King Co. v. Terminix Int'l Co.</u>, 105 F.3d 1192, 1194 (8th Cir. 1997); <u>see also</u> <u>Scott v. Prudential Sec., Inc.</u>, 141 F.3d 1007, 1012 (11th Cir. 1998) (surveying decisions of courts in Florida and Illinois). <u>But see</u> <u>John Hancock Life Ins. Co. v. Wilson</u>, 254 F.3d 48, 54 (2d Cir. 2001) (observing that in a previous case, the court had "interpreted and applied the Supreme Court's requirement that the parties evidence a 'clear and unmistakable' intent to submit the issue of arbitrability to the arbitrators" and "held that the parties evidenced such intent when they agreed that 'any and all controversies are to be determined by arbitration'").

the Construction Rules of Arbitration of the American Arbitration Association or its successor or an equivalent organization mutually agreed upon by the Parties." With respect to the latter, the Third Circuit has observed that "[v]irtually every circuit to have considered the issue has determined that incorporation of the [American Arbitration Association] rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." Chesapeake Appalachia, LLC v. Scout Petroleum, LLC, 809 F.3d 746, 763 (3d Cir. 2016) (collecting cases). This is so because many of the Association's rules provide that the arbitrator is afforded the power to rule on the arbitrator's jurisdiction, including disputes over the existence, scope, or validity of the arbitration agreement, and these courts reason that the incorporation of those rules by reference into an arbitration agreement is a clear and unmistakable manifestation of the parties' intent to arbitrate even threshold questions of arbitrability.[9] But this apparent consensus among the circuits is not as clear as it seems. Nearly every circuit to have addressed the issue, save the Eighth Circuit in Fallo v. High-Tech Institute, 559 F.3d 874 (8th Cir. 2009), addressed the question in the context of arbitration agreements entered into by organizations, not unsophisticated individuals. See Petrofac, Inc. v. DynMcDermott Petroleum Operations Co., 687 F.3d 671 (5th Cir. 2012); Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366 (Fed. Cir. 2006); Terminix Int'l Co. v. Palmer Ranch LP, 432 F.3d 1327, 1332 (11th Cir. 2005); Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005). The Ninth Circuit noticed this detail when it too was asked to adopt this line of reasoning in a dispute between two sophisticated organizational parties. While the court elected to join its sister circuits under those circumstances, the court carefully limited its holding to apply to only those arbitration

---

[9]      "Founded in 1926, the AAA has adopted (and amended) numerous rules over many years. The AAA website identifies more than fifty sets of rules." Chesapeake Appalachia, 809 F.3d at 761. Whether each of those sets of rules contains a similar jurisdictional grant is not an inquiry this Court has attempted.

agreements involving "sophisticated parties to commercial contracts," and "express[ed] no view as to the effect of incorporating arbitration rules into consumer contracts." See Oracle Am., Inc. v. Myriad Grp. A.G., 724 F.3d 1069, 1074-75 & n.2 (9th Cir. 2013).[10] Since then, the Ninth Circuit's district courts have split over whether to apply this reasoning to agreements that involve unsophisticated parties. See Aviles v. Quik Pick Express, LLC, No. CV-15-5214, 2015 WL 9810998, at *6 (C.D. Cal. Dec. 3, 2015).

The First Circuit has also expressed doubts about applying this reasoning to contracts involving unsophisticated parties. In Awuah v. Coverall North America, Inc., the court evaluated an arbitration clause contained within a series of franchise agreements entered into by the franchisor, a commercial janitorial cleaning service provider, and three individuals who operated "franchises" that performed the janitorial work. 554 F.3d 7, 8 (1st Cir. 2009). After observing that the franchisees were alleged to be "far from sophisticated business men and women," the court expressed serious doubt that a cross-reference to the rules of the American Arbitration Association in the arbitration clause was clear and unmistakable evidence that the parties intended to arbitrate disputes over arbitrability. The court recognized that "[i]t is doubtful that many people read the small print in form contracts, let alone the small print in arbitration rules that are cross-referenced by such contracts, however explicit the cross-reference." Id. at 12.

---

[10]    The Ninth Circuit considered the question again two years later, and again limited its holding to agreements between sophisticated parties, though this time the court sought to avoid the suggestion that a contrary result was mandated when unsophisticated parties are involved:

> Our holding today should not be interpreted to require that the contracting parties be sophisticated or that the contract be "commercial" before a court may conclude that incorporation of the AAA rules constitutes "clear and unmistakable" evidence of the parties' intent. Thus, our holding does not foreclose the possibility that this rule could also apply to unsophisticated parties or to commercial contracts.

See Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015). Nonetheless, some district courts in that circuit continue to refuse to extend this reasoning to agreements involving unsophisticated parties. See, e.g., Aviles, 2015 WL 9810998, at *6; Meadows v. Dickey's Barbecue Rests. Inc., No. 15-CV-02139, 2015 WL 7015396, at *7 (N.D. Cal. Nov. 12, 2015).

However, the court ultimately felt constrained by one of its precedents to hold otherwise. See id. at 10-11 ("If the matter were completely open in this circuit, we are not sure of the outcome.").

The matter appears to be an open question in this circuit, and this Court concludes that a cross-reference to a set of arbitration rules containing a provision that vests an arbitrator with the authority to determine his or her own jurisdiction does not automatically constitute clear and unmistakable evidence that the parties intended to arbitrate threshold questions of arbitrability— at least where those parties are unsophisticated.[11] Arbitration clauses themselves tend to be boilerplate, their enforceability implicating the fundamental tension in contract law between enforcing only those agreements that parties intended to make, see Alcorn Combustion Co. v. M. W. Kellogg Co., 166 A. 862, 863 (Pa. 1933) ("An agreement is the assent of two minds to the same thing."), and enforcing the letter of the documents that they sign, see Upton v. Tribilcock, 91 U.S. 45, 50 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained."). Whatever the theory for enforcing terms that are contained in boilerplate,[12] those terms themselves are not usually good evidence of the parties' intent. Under ordinary circumstances, when a party signs a form containing boilerplate, the most that person can be said

---

[11]    A different result may be warranted when sophisticated parties elect to make reference to certain arbitration rules because they may well have understood the implications of incorporating those rules by name into an arbitration agreement.

[12]    Pennsylvania, like many states, resolves this tension in individual cases through the language of unconscionability, which makes the enforceability of a term contained in a written agreement depend upon where the term is plotted along the twin axes of "procedural unconscionability" and "substantive unconscionability." See infra Section II(B). The doctrine of First Options that there be clear and unmistakable evidence of the parties' intent to arbitrate arbitrability before such an agreement will be enforced can be viewed as an application of that framework to this specific context. Under that view, because an agreement to arbitrate arbitrability is an "arcane" concept that a party would not likely expect to find in a larger agreement, see First Options, 514 U.S. at 945, an agreement to do so should not be enforced if the parties' intent is not clear. See Germantown Mfg. Co. v. Rawlinson, 491 A.2d 138, 146 (Pa Super. Ct. 1985) ("The parties will not be found to have agreed to an abnormal allocation of risks if the only evidence thereof is an inconspicuous provision in the boilerplate of the standard form. At a minimum, the reallocation must be physically conspicuous. Beyond that, it must have been manifested in a fashion comprehensible to the party against whom it is sought to be enforced." (quoting John Edward Murray, Murray on Contracts § 353 (2d ed. 1974))).

to have intended is his or her willingness to be bound to the terms that lie within, whatever they may be, provided that those terms are reasonable in light of the object of the contract. <u>See</u> Restatement (Second) of Contracts § 211 & cmts. b, f; Karl N. Llewellyn, <u>The Common Law Tradition</u> 370 (1960) ("Instead of thinking about 'assent' to boiler-plate clauses, we can recognize that so far as concerns the specific, there is no assent at all. What has in fact been assented to. . . is a blanket assent (not a specific assent) to any not unreasonable or indecent terms the seller may have on his form, which do not alter or eviscerate the reasonable meaning of the dickered terms."). With this understanding, it may be a difficult proposition to say that the text of an arbitration clause itself, when found among contract boilerplate, may constitute clear and unmistakable evidence of an unsophisticated party's intentions.[13] But incorporating forty pages of arbitration rules[14] into an arbitration clause is tantamount to inserting boilerplate inside of boilerplate, and to conclude that a single provision contained in those rules amounts to clear and unmistakable evidence of an unsophisticated party's intent would be to take "a good joke too far." <u>See</u> <u>Campbell Soup Co. v. Wentz</u>, 172 F.2d 80, 83 (3d Cir. 1948).

There is an additional reason why, under the circumstances of this case, the incorporation of the two aforementioned sets of arbitration rules by reference cannot serve as clear and unmistakable evidence of the parties' intent to arbitrate arbitrability. The arbitration clause provides that the rules of the American Arbitration Association are only a fallback in the event

---

[13]    <u>But see, e.g.</u>, <u>Jackson v. Rent-A-Ctr.-Weste Inc.</u>, No. 03:07-CV-0050, 2007 WL 7030394, at *2 (D. Nev. June 7, 2007), <u>aff'd in part, rev'd in part sub nom.</u> <u>Jackson v. Rent-A-Ctr. W., Inc.</u>, 581 F.3d 912 (9th Cir. 2009), <u>rev'd</u>, 561 U.S. 63 (finding the text of a clause contained in an arbitration agreement that an employee signed as a condition of employment to amount to clear and unmistakable evidence that the employee intended to arbitrate threshold questions of arbitrability).

[14]    The arbitration clause in the Agreement of Sale references the American Arbitration Association's "Construction Rules of Arbitration." It is unclear whether that reference would call for the application of the Association's "Home Construction Arbitration Rules and Mediation Procedures," which occupy forty-six pages, or the "Construction Industry Arbitration Rules and Mediation Procedures," which require fifty-six. At the time the Agreement was signed, a dispute may have been governed by the version of the Construction Industry Arbitration Rules and Mediation Procedures in effect at that time, which occupied twenty-nine pages, perhaps augmented by the Supplementary Procedures for Residential Construction Disputes, which occupied another eleven.

that the arbitration cannot be conducted in accordance with the rules and procedures of Construction Arbitration Services. Those rules do not appear to contain any clear delegation of authority to the arbitrator to determine questions of arbitrability.[15] When an arbitration clause references two possible sets of arbitration rules, one that delegates arbitrability and one that does not, the incorporation of both sets cannot constitute clear and unmistakable evidence of the parties' intent to arbitrate arbitrability, especially when it is only the fallback set of rules that contains that kind of delegation provision.

Taken together, the text of the arbitration clause contained in the Agreement of Sale—if that text is a valid source of evidence of the parties' intent in the absence of consideration—does not reveal that the parties clearly and unmistakably intended for an arbitrator to determine whether an agreement to arbitrate was ever formed. Nor does Toll suggest that either the buyers or Allstate engaged in any course of conduct that reveals their intent to arbitrate this dispute or that there is any other extrinsic evidence of that intent.  Accordingly, this question is for the Court to resolve.

Turning now to that question, the Agreement of Sale was clearly supported by consideration that flowed to the buyers. In addition to the promises that the buyers made to Toll, Toll made a series of promises to the buyers, such as agreeing to pay one-half of the real estate transfer taxes,[16] promising to furnish the buyers with a warranty deed,[17] committing to completing construction within two years of the date of the Agreement,[18] and providing a warranty on the residence for a period of ten years.[19] Those promises conferred benefits upon the

---

[15]    See Rules and Procedures for the Expedited Arbitration of Home Construction Disputes, Const. Arbitration Servs., http://www.buildingdisputes.net/forms/rhcd.pdf (last visited Mar. 11, 2016).
[16]    See Toll's Mot. Compel Ex. D ¶ 3.
[17]    Id. ¶ 2.
[18]    Id. ¶ 9(b).
[19]    Id. ¶ 10.

buyers, and that is all consideration requires. See Grossman, 795 F.2d at 299 (quoting Curry v. Estate of Thompson, 481 A.2d 658, 661 (Pa. Super. Ct. 1984)).

**B.**     **Allstate has failed to show that the arbitration clause is unconscionable.[20]**

Allstate also contends that, even if the Agreement of Sale was supported by consideration, the arbitration clause is unconscionable and cannot be enforced. Under Pennsylvania law, "a contract or term is unconscionable, and therefore avoidable, when there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it." Salley v. Option One Mortg. Corp., 925 A.2d 115, 119-20 (Pa. 2007) (citing Delinger, Inc. v. Dendler, 608 A.2d 1061, 1068 (Pa. Super. Ct. 1992)). Pennsylvania assigns the labels of "procedural" and "substantive" unconscionability to these two respective requirements. See id. at 119. Both must be present to find unconscionability, see id. at 199-20, 125; Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 224, 230 (3d Cir. 2008) (citing id. at 119-20), but the strength of one may outweigh the weakness of the other, see Quilloin v. Tenet Health Sys. Phila., Inc., 673 F.3d 221, 230 (3d Cir. 2012) (observing that in Salley, the Pennsylvania Supreme Court "indicated that it might be appropriate to use a 'sliding-scale approach' so that 'where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required" (quoting Salley, 925 A.2d at 125 & n.12)).

To Allstate, the agreement to arbitrate suffers from procedural unconscionability because the buyers were in a vulnerable position when they entered into the Agreement of Sale. According to Allstate, at the time they entered into the Agreement the buyers had already paid a substantial deposit to Toll and construction had already begun on their residence, leaving them to

---

[20]     This is a question for the Court, not an arbitrator, because Allstate's argument specifically attacks the validity of the arbitration clause, see Prima Paint, 388 U.S. at 403-04, and, as the Court has found, the arbitration clause does not clearly and unmistakably reveal that the parties intended to arbitrate threshold questions of arbitrability, cf. Rent-A-Center, 561 U.S. at 71-72.

believe that they could not object to any portion of the Agreement without risking their deposit. As for the source of the clause's substantive unconscionability, Allstate reads the terms of the arbitration clause to require only the buyers, and not Toll, to arbitrate, which Allstate says "creates a presumption of unconscionability."[21]

Toll disputes Allstate's characterization of the circumstances surrounding the execution of the Agreement, but this dispute does not need to be resolved. Under Pennsylvania law, an agreement or term is unconscionable only if the term is both procedurally unconscionable and substantively unconscionable. Even if Allstate is correct that the execution of the Agreement was tainted by procedural unconscionability, Allstate has failed to show that the terms of the clause are substantively unconscionable. Without a showing of both forms of unconscionability, the clause must stand. See Zimmer, 523 F.3d at 230 (declining to consider whether the district court correctly determined that an arbitration agreement was substantively unconscionable after reaching the conclusion that the clause was not procedurally unconscionable).

Allstate believes that the terms of the arbitration clause are substantively unconscionable because the clause requires only the buyers, but not Toll, to arbitrate. Allstate's reading of the clause derives from two specific passages. The first states, "Buyer . . . hereby agree[s] that any and all disputes with Seller . . . shall be resolved by binding arbitration." To Allstate, the fact that this passage states that only the buyers agreed to arbitrate all disputes with Toll—rather than stating that both parties agreed to arbitrate with each other—means that the clause must apply only to the buyers. But Allstate may be reading too much into the syntax of this passage, because the phrase "disputes with Toll" is broad enough to encompass both claims that the buyers could have against Toll and claims that Toll could have against the buyers. If, for example, the buyers had refused to pay part of the purchase price of the residence and Toll brought suit against the

---

[21]     Allstate Mem. Opp'n 5 (quoting Hopkins v. New Day Fin., 643 F. Supp. 2d 704, 719-20 (E.D. Pa. 2009)).

buyers, that dispute would be no less a "dispute with [Toll]" simply because it was Toll, and not the buyers, that filed the lawsuit.

The second passage Allstate relies upon, located at the very end of the arbitration clause, states, "Buyer hereby waives the right to a proceeding in a court of law (including without limitation a trial by jury) for any claims or counterclaims brought pursuant to this agreement." Since this passage speaks only to the buyers, Allstate believes that only they buyers have waived their right to proceed in court. That conclusion, however, is not clear. These types of warnings are included in arbitration agreements to bolster the prospect of their enforcement against less sophisticated parties who may claim that they failed to understand the ramifications of arbitration, and courts often point to them for support when rejecting those very arguments. See, e.g., Clerk v. First Bank of Del., 735 F. Supp. 2d 170, 183 n.4 (E.D. Pa. 2010) (noting that the inclusion of "several lines in capital letters relating to the waiver of jury trial rights" weighed in favor of enforceability); MacPherson v. Magee Mem'l Hosp. for Convalescence, 128 A.3d 1209, 1221 (Pa. Super. Ct. 2015) (enforcing an arbitration agreement in part because "the Agreement contain[ed] a conspicuous, large, bolded notification that the parties, by signing, are waiving the right to a trial before a judge or jury"). It should not be surprising, therefore, that these warnings are often written in a manner that speaks directly, and exclusively, to the less sophisticated party in the transaction. See, e.g., Cuie v. Nordstrom, Inc., No. CIV.A 05-CV-4771, 2005 WL 2922017, at *4 (E.D. Pa. Nov. 3, 2005) (reviewing an arbitration clause in an employment agreement that contained the following language: "I understand that by signing this agreement, I knowingly agree and consent to arbitrate any covered claim between myself and Nordstrom . . . . I explicitly waive my right to a jury trial or bench trial on any claims involving employment disputes between myself and Nordstrom."); Bullick v. Sterling Inc., No. CIV.A. 03-

18

6395, 2004 WL 2381544, at *4 (E.D. Pa. Oct. 21, 2004) (reviewing an arbitration clause in another employment agreement that contained the following language: "By signing this application, and in exchange for being hired by the company, you knowingly and voluntarily waive your applicable statutory rights to file a lawsuit against the company for a covered claim."). The passage at issue here, which is set in bold text and capital letters, may have simply been an attempt by Toll to preempt a future argument from the buyers that they did not understand the rights they were agreeing to waive, rather than any indication that the arbitration clause was intended to apply only to them.

Allstate's reading of the arbitration clause is not devoid of merit. The United States Court of Appeals for the Fourth Circuit construed precisely the same arbitration clause that is at issue here, involving precisely the same defendant, and concluded that "reasonable and longstanding grammatical, linguistic and 'plain language' principles, make clear that the provision did not bind Toll Brothers to arbitration." See Noohi v. Toll Bros., 708 F.3d 599, 611 (4th Cir. 2013). While this Court does not agree with Noohi's reasoning,[22] the clause is at least somewhat

---

[22]     The Noohi court pointed out that the arbitration clause contains a non-exhaustive list of claims that must be arbitrated: "disputes concerning breach of contract, express and implied warranties, personal injuries and/or illness, mold related claims, representations and/or omissions by Seller, on-site and off-site conditions and all other torts and statutory causes of action." The court reasoned that this list of claims further demonstrates that the clause is one-sided, because "all the types of claims given as examples . . . are claims that the buyer would bring against the seller." Noohi, 708 F.3d at 610. But while a buyer of a home may have a variety of claims that could arise against the seller, there tends to be only one type of claim that a seller could assert against a buyer: breach of contract. Indeed, another section of the Agreement of Sale (which was also present in the agreement before the Noohi court) provides that if the buyers were to default "in performing any of [their] obligations under [the] Agreement," Toll's "sole remedy" would be to terminate the Agreement and retain any existing payments as liquidated damages. See Toll's Mot. Compel Ex. D ¶ 6(a). The list of claims includes "breach of contract," so the list does not appear to lend support to the argument that the arbitration clause binds only the buyer to arbitrate.

     The Noohi court also pointed to the fact that the arbitration clause contains a notice-and-cure provision that requires the buyer to notify Toll in advance at a particular address before initiating arbitration and to allow Toll a reasonable opportunity to cure the default, but contains no similar provision for the benefit of the buyer. See Noohi, 708 F.3d at 610. But the Noohi court appears to have overlooked the fact that a separate part of the Agreement affords the buyer a similar notice-and-cure period, providing that in the event of a breach by the buyer, Toll's remedies are not available until the buyer's "default continues for 7 days after written notice." That the arbitration clause requires the buyer to afford notice to Toll at a particular address (directed to the attention of "Warranty Dispute Resolution") is also not surprising; organizations often include in their contracts a specific address for communication of any notice of default to ensure that the notice is received by the appropriate company personnel.

ambiguous, and if Toll intended for this arbitration clause to bind both parties—as it now argues—it would be well served to clarify this point in future agreements. However, even if Allstate and Noohi are correct that the clause is one-sided, that alone does not mean that the clause is substantively unconscionable under Pennsylvania law.

Allstate contends that "the reservation by a company to itself of access to a court, to the exclusion of the consumer, creates a presumption of unconscionability."[23] In 2002, the Superior Court of Pennsylvania took that position in the context of a consumer lending transaction that reserved certain judicial remedies exclusively to the creditor, concluding that, "under Pennsylvania law, the reservation by [a financial institution] of access to the courts for itself to the exclusion of the consumer creates a presumption of unconscionability." See Lytle v. CitiFinancial Servs., Inc., 2002 PA Super 327, ¶ 36. But in 2007, the Supreme Court of Pennsylvania concluded that while "Lytle was well intentioned," that decision "swept too broadly" because "the burden of establishing unconscionability lies with the party seeking to invalidate a contract." See Salley, 925 A.2d at 129. The arbitration agreements at issue in both Lytle and Salley were of a different sort than the arbitration clause at issue here, because they reserved for one party access to the courts for only certain judicial remedies, like foreclosure, rather than (in Allstate's view) fully opening the courthouse doors for one party while entirely shutting out the other. Based on that distinction, some courts have read Salley narrowly, confining it to its facts and concluding that the presumption of unconscionability announced in Lytle has continuing vitality when an arbitration agreement purports to entirely exclude one party from its reach. See, e.g., Hopkins v. New Day Fin., 643 F. Supp. 2d 704, 719-20 (E.D. Pa. 2009) ("The Pennsylvania Supreme Court . . . cast doubt as to the validity of the presumption in

---

[23]     Allstate's Mem. Opp'n Toll's Mot. 5 (quoting Hopkins v. New Day Fin., 643 F. Supp. 2d 704, 719-20 (E.D. Pa. 2009)).

Lytle, but did not overrule it in all respects."); DePrizio v. LTS Realty Co., No. 3:CV-05-2273, 2008 WL 169640, at *3 (M.D. Pa. Jan. 16, 2008) ("We adopt the survived reasoning of the Superior Court in Lytle to conclude that the arbitration agreement at issue here is procedurally and substantively unconscionable, and therefore unenforceable.").

The Third Circuit, albeit in dicta, has rejected that reading of Salley. See Zimmer, 523 F.3d at 230-31. There, the court reviewed a district court's decision to presume, pursuant to Lytle, that an arbitration clause that clearly required only one party to arbitrate while leaving the other free to seek judicial relief was substantively unconscionable. The Zimmer court concluded that the district court had erred, because "the Salley decision rejected the presumption relied upon by the District Court in finding substantive unconscionability." Id. at 230.

The Third Circuit has an accurate reading of Salley.[24] The focus of the Pennsylvania Supreme Court's decision is that a presumption of unconscionability improperly relieves the party challenging an arbitration agreement of the burden of demonstrating its invalidity and ignores the fact that the unconscionability inquiry is "often fact specific." See Salley, 925 A.2d at 124, 129. This is true regardless of whether an arbitration agreement carves out certain claims from its reach or allows an entire party to be exempt from arbitration. The foundation of modern arbitrability jurisprudence is that "arbitration clauses substitute one procedurally fair forum for another." See Edwards v. HOVENSA, LLC, 497 F.3d 355, 364 (3d Cir. 2007) (quoting David S. Schwartz, Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration, 1997 Wis. L. Rev. 33, 110 (1997)). Presuming that an agreement to arbitrate is unconscionable simply because it channels only one party's claims to arbitration conflicts with that principle, and conflicts with the intent of both the federal and

---

[24]     DePrizio was decided without the benefit of this guidance from the Third Circuit, and Hopkins, which was decided after Zimmer, failed to acknowledge Zimmer's discussion of this issue.

Pennsylvania legislatures to "place arbitration agreements upon the same footing as other contracts." See id. at 363-64 (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991)); Salley, 925 A.2d at 119 n.2 (recognizing that "Pennsylvania law reflects an identical policy" to that of the Federal Arbitration Act). As the Third Circuit recognized, "the Pennsylvania Supreme Court did not hold . . . that unequal access to the courts can never be the basis for finding an arbitration agreement unconscionable" but "[t]he conclusion in each case will depend upon the circumstances." See Zimmer, 523 F.3d at 231.

Here, Allstate has elected to stand exclusively on its contention that a one-sided arbitration clause is presumptively unconscionable under Pennsylvania law. See Allstate's Mem. Opp'n Toll's Mot. 8 ("Toll Brothers rather conspicuously reserves its own right to pursue any future disagreements before a jury, while affirmatively denying the [buyers] that same right through the language contained within the Sales Agreement. Such an action is unconscionable on its face."). While a one-sided arbitration clause may be substantively unconscionable, Allstate bears the burden of explaining why, under these circumstances, such an arrangement unreasonably favors Toll.  Because Allstate has made no attempt to do that, Allstate has failed to show that the arbitration clause is unconscionable. Having failed to show that the arbitration clause is unconscionable or that the Agreement of Sale lacked consideration, Allstate must arbitrate its claims against Toll.[25]

### III. Toll cannot compel Allstate to arbitrate its claims against Commonwealth Fire and United Insulation.

Toll also seeks to compel Allstate to arbitrate the claims it has asserted against Toll's subcontractors, Commonwealth Fire and United Insulation. Toll points to the fact that both

---

[25]     Because "it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that [Allstate's] claims 'are subject to an enforceable arbitration clause,'" there is no need for discovery on the question of arbitrability. See Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 776 (3d Cir. 2013) (quoting Somerset Consulting, LLC v. United Capital Lenders, LLC, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).

subcontractors entered into agreements with Toll to arbitrate any disputes arising out of the work they performed. Therefore, Toll reasons, "United and Commonwealth are contractually obligated to participate in arbitration as the claims in Plaintiff's complaint arise out of their work, thus triggering the arbitration provision" contained in those agreements.[26] But while those agreements may allow Toll to compel the subcontractors to arbitrate with Toll, the buyers were not parties to those agreements. Even assuming that Toll has the capacity to compel Allstate to arbitrate claims it has asserted against two third parties,[27] Toll has not shown that Allstate is bound to arbitrate with the subcontractors in the absence of an agreement between them.

Arbitration agreements are matters of contract, which means that it is possible to compel a party to an arbitration agreement to arbitrate with a non-party, or vice versa, when consonant with principles of contract law. See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630-31 & n.6 (2009). There are two possible theories that could require Allstate to arbitrate with the subcontractors: the subcontractors could be seen as third-party beneficiaries of the arbitration clause contained in the Agreement of Sale, or Allstate could be equitably estopped from opposing arbitration with them. But under these circumstances, neither applies.

## A.       The subcontractors are not third-party beneficiaries of the Agreement of Sale.

[A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, unless, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

---

[26]     Mem. Supp. Toll's Mot. Compel 5, ECF No. 27.

[27]     See 9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."); Republic Bank & Trust Co. v. Kucan, 245 F. App'x 308, 311-12 & n.1 (4th Cir. 2007) (concluding that a signatory to a tripartite arbitration agreement could insist that a dispute between the other two signatories be resolved through arbitration); Gibson v. Wal-Mart Stores Inc., 181 F.3d 1163, 1170 (10th Cir. 1999) (affirming a district court's decision to direct a plaintiff to arbitrate claims that the plaintiff had brought against two different defendants, despite the fact that only one of the defendants had moved to compel arbitration).

Scarpitti v. Weborg, 609 A.2d 147, 150-51 (Pa. 1992) (citation omitted) (citing Guy v. Liederbach, 459 A.2d 744 (1983); Spires v. Hanover Fire Insurance Co., 70 A.2d 828 (Pa. 1950) (plurality opinion)).

It is clear from the language of the Agreement of Sale that the parties did not express an intention for Toll's subcontractors to derive the benefits of the buyers' agreement to arbitrate. According to the arbitration clause, Toll sought the buyers' agreement to arbitrate "any and all disputes with Seller (Toll), Seller's parent company or their subsidiaries or affiliates." Had the parties intended to expand the scope of this agreement to the benefit of any subcontractors performing work for Toll, they clearly could have done so. Nor do the circumstances compel the conclusion that the subcontractors must be afforded the right to compel Allstate to arbitrate in order to effectuate the intentions of the buyers and Toll concerning the sale of the residence, or that Toll intended to afford the subcontractors, who, as far as the parties have suggested, are related to Toll only by sub-contract, rights under the Agreement.

**B.    Allstate is not equitably estopped from refusing to arbitrate with the subcontractors.**

Under certain circumstances, a party may be estopped from refusing to arbitrate with a party with whom it had never contracted.

> [T]here are two theories of equitable estoppel in this context. First, courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement. Second, courts have bound a signatory to arbitrate with a non-signatory "at the nonsignatory's insistence because of 'the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.'"

E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 199-200 (3d Cir. 2001) (second alteration in original) (citation omitted) (quoting

24

Thompson-CSF, S.A. v. Am. Arbitration Assoc., 64 F.3d 773, 778 (2d Cir. 1995)). There are two sets of arbitration clauses at issue here: the arbitration clauses contained in the agreements entered into between Toll and the subcontractors, to which the buyers are not parties, and the arbitration clause present in the Agreement of Sale between the buyers and Toll, to which the subcontractors are not parties. The first theory of equitable estoppel focuses on the former, while the second theory focuses on the latter.

"Under the first theory, courts prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." DuPont, 269 F.3d at 200 (citing Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999)). For Allstate to be bound to arbitrate under the first theory, either Allstate or the buyers would have had to avail themselves of the agreements that Toll made with the subcontractors, but Toll does not suggest that the buyers (or Allstate) knowingly exploited those agreements or that the buyers (or Allstate) were aware of their very existence prior to Toll attaching copies of them to its present motion. For the second theory to apply, Allstate's claims against the subcontractors would have to relate to duties or obligations that the subcontractors had under the Agreement of Sale between the buyers and Toll, but neither of the subcontractors had any obligations or duties under that Agreement. See Just B Method, LLC v. BSCPR, LP, No. 14-1516, 2014 WL 5285634, at *9 (E.D. Pa. Oct. 14, 2014). Therefore, neither theory of equitable estoppel supplies a basis to prevent Allstate from refusing to arbitrate with either of the subcontractors.

## IV.     Conclusion

The arbitration clause contained in the Agreement of Sale is enforceable, which means that Allstate must arbitrate its claims against Toll. However, Allstate cannot be compelled to

arbitrate the claims it has asserted against Commonwealth Fire and United Insulation because the buyers did not enter into an arbitration agreement with them, and no other contractual theory supplies a basis to bind them to arbitrate. This action, however, will be stayed pending the outcome of the arbitration of Allstate's claims against Toll.[28]


BY THE COURT


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

[28]     "In some cases, . . . it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket." Moses H. Cone Mem'l Hosp. v. Mecury Constr. Corp, 460 U.S. 1, 21 n.23 (1983) (citing Landis v. N. Am. Co., 229 U.S. 248, 254-55 (1936)). Because the factual disputes between Allstate and all three defendants are intertwined and there is a potential for inconsistent rulings, Allstate's claims against the subcontractors are stayed pending the outcome of arbitration with Toll. See Medversant Techs., LLC v. Leverage Health Sols., LLC, 114 F. Supp. 3d 290, 299 (E.D. Pa. 2015) (quoting Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., 544 F.2d 1207, 1215 (3d Cir. 1976)).